1

2

3

4

5

6                            UNITED STATES DISTRICT COURT

7                                 DISTRICT OF NEVADA

8                                          * * *

9   UNITED STATES OF AMERICA,            )
                                         )
10                  Plaintiff,           )            2:05-cr-00304 RCJ-RJJ
                                         )
11                                       )      REPORT &   RECOMMENDATION
    vs.                                  )           OF UNITED STATES
12                                       )         MAGISTRATE JUDGE
                                         )      (Defendant's Motion to Suppress (#68))
13  ELIJAH WILLIE AKPAN,                 )
                                         )
14  _____Defendant._____  )

15          This matter is before the Court on Defendant, Elijah Willie Akpan's Motion to Suppress

16   Evidence (#68).  The Court has considered Defendant's Motion (#68), the Government's Response

17   (#82), Defendant's Reply (#89),and the Government's Supplement to the Motion to Suppress

18   Evidence (#109),  in addition to the evidence and arguments presented at the evidentiary hearing.

19                                     **BACKGROUND**

20          In August 2003, the Health and Human Services-Office of Inspector General and the State

21   of Nevada Attorney General's Office commenced an investigation on Elijah Willie Akpan and two

22   of his businesses: Tropicana Medical Supply (TMS); and Durable Medical Equipment (DME).  The

23   Government believed Akpan was defrauding Medicare and Medicaid, in violation of Title 18, United

24   States Code, Section 1347.  In the late months of 2003, and the early months of 2004, Government

25   investigators interviewed several former TMS employees.   From the interviews, the Government

26   determined that it was highly probable that Akpan was defrauding Medicare and Medicaid.

27          During the investigation, the Government conducted several statistically valid random

28   samples of TMS's customer base to determine the extent of the alleged fraud.  The samples  were

1   generated from Medicare and/or Medicaid beneficiaries whose accounts were: (1) billed by TMS

2   between January 1, 2000, and September 1, 2003; and (2) billed for at least one of the following:

3   wheelchairs and accessories; enteral nutrition; ostomy supplies; or incontinence supplies. The

4   sampling produced a total of one-hundred and one (101) Medicare and Medicaid beneficiaries

5   allegedly defrauded.

6       The Government continued its investigation until it submitted an application for a search

7   warrant, at the end of 2004, to search Akpan's residence and several of TMS's and DME's business

8   locations. The search warrant application consisted of the search warrant, a sworn affidavit, and

9   three attachments A, B, and C. Attachment A of the search warrant listed six locations to be

10  searched, Attachment B listed items to be seized, and Attachment C listed the names of the allegedly

11  defrauded Medicare/Medicaid beneficiaries. The attached Affidavit established probable cause to

12  issue the warrant.

13      On January 5, 2005, a federal magistrate judge granted the search warrant for the following

14  six locations: (1) 5020 East Tropicana Avenue, Suite 5B, Las Vegas, Nevada; (2) 8536 Del Webb

15  Boulevard, Las Vegas, Nevada; (3) 2797 S. Maryland Parkway, Suite 12-A, Las Vegas, Nevada; (4)

16  4888 E. Tropicana Avenue, Unit 1017, Las Vegas, Nevada; (5) 4888 E. Tropicana Avenue, Unit

17  1018, Las Vegas, Nevada; and (6) 7431 Bachelors Button Drive, Las Vegas, Nevada. The

18  Government simultaneously executed the searches on all of these locations on January 5, 2005.

19      In July 2005, a grand jury issued a criminal indictment charging Akpan with twelve counts

20  of health care fraud in violation of 18 U.S.C. § 1347. Indictment (#1). On May 10, 2006, the

21  Government filed a Superseding Indictment (#25), charging. Akpan with 129 counts of health care

22  fraud in violation of 18 U.S.C. § 1347; and one criminal forfeiture allegation pursuant to 18 U.S.C.

23  § 982(a)(7) and (b)(1).

24      Akpan now files a Motion to Suppress (#68) the evidence collected from the six locations

25  in the search warrant, and statements made by Akpan. He argues that the statements and evidence

26  obtained from the searches conducted on January 5, 2005, should be suppressed because: (1) the

27  search warrant lacked particularity; (2) the execution of the search warrant by the Government was

28  conducted in an unconstitutional manner; and (3) Akpan was subjected to an unconstitutional

1    interrogation.  The Court heard testimony from both the Government and the Defense during a three

2    day evidentiary hearing.  The Court now determines Akpan's Motion to Suppress (#68).

3                                              **FACTS**

4    **I. Search of Defendant's Residence**

5            On January 5, 2005, Federal Agents executed a federal search warrant on Akpan's residence

6    located at 7431 Bachelors Button Drive, Las Vegas, Nevada 89131.  The agents arrived at the

7    residence at approximately 12:05 p.m.  Upon arriving at the door, the agents knocked and announced

8    their presence indicating that they were executing a federal search warrant on the residence.  Akpan

9    and some of his family were inside the residence.  Akpan opened the door and the agents explained

10   to that he was not under arrest, but that they were there to execute a search warrant on the residence.

11   The search warrant and attachments were immediately presented to Akpan.  The agents entered the

12   residence, with no guns drawn, to preform a protective sweep of the residence.  An agent informed

13   Akpan that no calls could be made or received during the protective sweep.  Once the protective

14   sweep was completed and the residence was secured, phone calls would be allowed.  The no call rule

15   was given to protect the agents located at the other five locations that were being simultaneously

16   searched.

17          Once the house was secured, the agents informed Akpan and his family that they could leave

18   at any time and were not required to stay at the residence; however, if they decided to leave they

19   would not be allowed to re-enter the residence until after the search was completed.  If Akpan and

20   his family remained in the home, his family would have to remain in a central location for the

21   protection and safety of the agents.  Akpan told the agents that he and his family were going to stay

22   and Akpan asked his family to move to a family room in the basement.

23          Once the protective sweep was completed and prior to searching the residence, an agent took

24   photographic images and made a videotaped recording the condition of the residence prior to the

25   search.  The agents then began searching the residence.  During the search, agents set up electronic

26   devices in the kitchen of the residence to copy computer hard drives located in the residence.

27   Akpan's family was allowed to get food and water from the kitchen; however, the family was not

28   allowed to use the microwave to heat food due to the fact that using the microwave could interrupt

1  the imaging of the computers.

2          The agents asked Akpan if they could interview him.  Prior to the interview, an agent

3  informed Akpan that he was not under arrest, that the interview was voluntary, and he could leave

4  at any time.  Akpan asked the agents whether he needed his attorney, specifically asking, "Do I need

5  my attorney?"  The agents responded that they could not give him advice as to whether he needed

6  his attorney.  Akpan responded by stating he had nothing to hide and agreed to speak with the

7  interviewing agents without an attorney. Akpan was interviewed twice and no Miranda warnings

8  were given.

9          Akpan's first interview began at approximately 12:30 p.m.  During this interview, Akpan

10 was asked about his educational background and work experience.  The agents asked Akpan about

11 his TMS business, including: employees; supervising employee's duties; general order filling

12 procedures; and medicare billing procedures.  Questions were also asked about his finances,

13 including: annual salary; assets owned; checking accounts; and  other business ventures.  The first

14 interview ended at approximately 3:00 p.m., and Akpan was allowed to join his family in the

15 basement of his residence.

16         Akpan's second interview began at approximately 3:50 p.m.  Akpan was once again told that

17 the interview was voluntary and that he could leave at any time.  During the second interview, Akpan

18 was asked about specific fraudulent Medicaid and Medicare billing  incidents.    During this

19 interview, Akpan made incriminating statements.  The second interview ended at approximately 5:00

20 p.m.

21         At the conclusion of the search, exit photographs and a videotape recording were taken to

22 show the condition of the residence. Akpan, along with an agent, conducted a final walk through of

23 the residence.  A receipt of the property seized from the residence was given to Akpan and at

24 approximately 6:45 p.m. the agents exited the residence and left the premises.

25 **II.  Search of Defendant's Business Locations**

26         On January 5, 2005, agents also executed a federal search warrant on three of Akpan's

27 business locations and two storage units.  The three business locations, and two storage units are:

28 (1) 5020 East Tropicana Avenue, Suite 5B, Las Vegas, Nevada; (2) 8536 Del Webb Boulevard,

Las Vegas, Nevada; (3) 2797 S. Maryland Parkway, Suite 12-A, Las Vegas, Nevada; (4) 4888 E. Tropicana Avenue, Unit 1017, Las Vegas, Nevada; and (5) 4888 E. Tropicana Avenue, Unit 1018, Las Vegas, Nevada.  The searches of these five locations were conducted simultaneously with the search of Akpan's residence.

At all of the five locations, the agents knocked and announced their presence.  The search warrant was presented to the employees at the business locations; however, nobody was present at the storage units for the agents to present the warrant.  A protective sweep of each location was conducted and the employees of the three business locations were allowed to stay in the office if an emergency arose; otherwise, the employees were asked to wait outside.  The searches of the five locations each lasted approximately one to two hours.  After the searches were completed, the search warrant and inventory list of the items seized were left at the three business locations. Due to the fact that no person was present at the storage units, agents gave the inventory of items seized from the storage units to an employee at one of the other business locations.

**DISCUSSION**

**I. Search Warrant**

General warrants that allow  "a general, exploratory rummaging in a person's belongings" are prohibited by the Fourth Amendment.  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971); see also United States v. Rude, 88 F.3d 1538, 1551 (9th Cir. 1996).  Search warrants must contain sufficient particularity that are "reasonably specific, rather than elaborately detailed" to give meaningful guidance to the searching officers.  Rude, 88 F.3d at 1551.  A warrant "must be specific enough to enable the person conducting the search [to] reasonably . . . identify the things authorized to be seized;" otherwise the warrant will be viewed as an unconstitutional general warrant.  United States v. Spilotro, 800 F.2d 959, 963 (9th Cir. 1986).  A general warrant violates the particularity requirement of the Fourth Amendment because it gives the executing officers unbridled discretion of conducting an exploratory rummaging through a defendants belongings in hopes of finding some criminal evidence.  Coolidge, 403 U.S. at 467. The Ninth Circuit has stated:

1

2

3

4

5

> In determining whether a description is sufficiently precise, we have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant; . . . (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; . . . and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

6

<u>Spilotro</u>, 800 F.2d at 963.

7

8        In the present matter, Akpan argues that the search warrant for his residence and business

9  locations is an unconstitutional "general warrant" because no date restrictions for the records to

10 be seized existed on the face of the warrant, affidavit or attachments.  Under the first prong of

11 <u>Spilotro</u>, probable cause must exist to seize all items of a particular type described in the warrant.

12 800 F.2d at 963.  If the warrant directs officers to seize every document on the premises, without

13 limitations, including documents unrelated to the specific criminal activity, then the warrant will

   be viewed as unconstitutional.  <u>United States v. Kow</u>, 58 F.3d 423, 427 (9th Cir. 1995).

14

15       Here, Attachment C to the search warrant limited the patient/client files and records to

16 one-hundred and three (103) individuals.  Moreover, approximately twenty-one types of

17 documents were  to be seized and a date restriction was set for "[p]ersonnel files of all persons

18 employed . . . for the years 2000 to present."  Government's Response (#82) Attachment 1 at 43.

19 In <u>Kow</u>, the search warrant allowed the seizure of everything; however, here, only documents for

20 103 specific patients were being sought.  58 F.3d at 427.  The warrant limited the documents to

21 the seizure of 103 patient/client files and records specifically related to the alleged Medicare and

22 Medicaid fraud.  The agents did not seize all of Akpan's patient records, only the 103 patients

23 listed in Attachment C to the warrant, and  probable cause existed that Akpan allegedly used

24 these patients to defraud Medicare and Medicaid.  The Court finds that probable cause existed  to

25 seize all of the 103 patient/client files and records described in the warrant and pertinent

   attachments.

26

27       Under the second prong of <u>Spilotro</u>, an analysis of the breadth of the warrant must be

28 performed to determine "whether the warrant sets out objective standards by which executing

1    officers can differentiate items subject to seizure from those which are not."  800 F.2d at 963.

2    The Ninth Circuit has held that "[a] generalized seizure of business documents may be justified if

3    the government establishes probable cause to believe that the entire business is merely a scheme

4    to defraud or that all of the business's records are likely to evidence criminal activity."

5    Moreover, other circuits have found that "if the fraud operation under investigation was ongoing,

6    evidence of illegal activity in the past would be relevant to the conspiracy, while records of

7    legitimate transactions prior to the conspiracy will help determine how and when the fraud

8    scheme began."  See United States v. Zanche, 541 F. Supp. 207 (D.N.Y. 1982); United States v.

9    Slocum, 708 F.2d 587, 603 (11th Cir. 1983); United States v. Soussi, 29 F.3d 565, 569 (10th Cir.

10   1994).  To that end, it may be necessary to obtain documents prior to the scheme because a

11   complex scheme can be proved  only  "by piecing together many bits of evidence [similar to] a

12   jigsaw puzzle, [and] the whole picture of . . . [the] scheme . . . could be shown only by placing in

13   the proper place the many pieces of evidence that, taken singly, would show comparatively

14   little."  Andresen v. Md., 427 U.S. 463, 482 (1976) (internal quotations omitted).

15        In the present matter, Akpan argues that because the warrant, affidavit or attachments

16   contained no date restrictions the Government could seize up to ten years worth of documents,

17   which is unconstitutional.  The Court disagrees. The Government did not seize all of Akpan's

18   business documents.  Probable cause did not exist to establish that Akpan's entire business was

19   merely a scheme to defraud or that all of the business's records would show criminal activity;

20   however, the Government did establish probable cause to show that all of the business's records

21   related to the 103 patients listed in Attachment C would likely evidence criminal activity.  Even

22   though no date restrictions existed for the 103 patient/client files and records; the Court finds that

23   the records seized were necessary for the Government to create its case.  Similar to a jigsaw

24   puzzle, the documents seized by the Government help determine how and when the alleged fraud

25   scheme began.

26        After the suppression hearing, the Court was given, in camera,  a detailed schedule of

27   items seized by the Government in the Government's Supplement to the Motion to Suppress

28   Evidence (#109).  After reviewing this schedule, the Court found that only 55 documents out of

1    8167 documents seized were before 2000.  The majority of documents that predated 2000 were

2    Akpan's Medicare re-enrollment applications.  The Court also found that only patient documents

3    for the names listed in Attachment C were in the Government's possession.  Although the dates

4    for these patient documents range from 1999 to the present, the documents are necessary for the

5    Government's case and within the scope of the warranted language.

6            Lastly, the warrant along with the affidavit and attachments were present for review

7    during the search, and any agent with questions could have referenced the documents or asked

8    the supervising agent questions.  If there was any doubt as to the breadth of the warrant, the

9    supervising agents were present to help the seizing agents determine what could be taken.  The

10   Court finds that the warrant along with the affidavit and attachments set out objective standards

11   by which the agents could differentiate the items subject to seizure from those which were not.

12           Under the third prong outlined in Spilotro, the Court must determine "whether the

13   Government was able to describe the items more particularly in light of the information available

14   to it at the time the warrant was issued."  800 F.2d at 963.  In the present matter, random samples

15   were generated by the Government to determine the extent of the alleged fraud scheme.  From

16   the samples, approximately 101 allegedly defrauded beneficiaries of TMS were identified.  This

17   amount is less than 5% of TMS's active customer base.  Later, when the warrant was issued, the

18   Government described documents for 103 patients, still less than 5% of the active customer base.

19   Under these circumstances, the Court finds that the Government was not able describe the items

20   more particularly in light of the information available to the Government at the time the warrant

21   was issued.

22           When determining whether a search warrant is unconstitutional, a careful balance must be

23   struck between the need for documents in business record seizure situations and the need for

24   particularity.  Based on the totality of the circumstances, the Court finds that the search warrant

25   along with the affidavit and attachments were sufficiently particular and constitutional and did

26   not amount to a general unconstitutional search warrant.

27   **II. Reasonableness of the Searches**

28           In order to challenge the reasonableness of a search, a defendant must establish standing.

1   Once standing is established, it becomes the defendant's burden to show that under the totality of

2   the circumstances, his legitimate expectation of privacy was violated.  United States v. Parks,

3   285 F.3d 1133, 1141 (9th Cir. 2002).  The defendant must show that a "subjective expectation of

4   privacy in the area searched"existed; and the expectation of privacy must be "one that society

5   would recognize as objectively reasonable." Id. at 1141.  The Fourth Amendment allows the

6   issuance of a search warrant if probable cause exists; however, the Ninth Circuit holds that even

7   if a warrant is supported by probable cause, a search or seizure may be invalidated if the

8   execution of the warrant is conducted in an unreasonable fashion.  U.S. CONST. amend IV; see

9   Franklin v. Foxworth, 31 F.3d 873, 875 (9th Cir. 1994).  In determining whether a search is

10  unreasonable, an objective test is used based on the facts and circumstances confronting the

11  officers conducting the search.  Franklin, 31 F.3d at 875.  Typically, if excessive police force is

12  used when executing a search warrant, the search will be seen as unconstitutional; however, this

13  is not the only factor that must be considered.  Franklin, 31 F.3d at 875.  A court must look at the

14  reasonableness in each specific case and must consider "whether the totality of the circumstances

15  justifies a particular sort of [search] or seizure." Franklin, 31 F.3d at 875.

16      **A. Residence**

17      In the present matter,  Akpan has standing to challenge the reasonableness of the search

18  conducted on his residence.  The Government established probable cause by showing that Akpan

19  billed Medicaid and Medicare for all of his TMS's clients from his residence located at 7431

20  Bachelors Button Drive, Las Vegas, Nevada.  When the agents arrived at the residence, the

21  agents knocked and announced their presence.  A protective sweep was conducted on the

22  residence for officer safety but once the protective sweep was completed the agents informed

23  Akpan and his family that they were free to leave. Akpan and his family decided to stay.  The

24  agents did not ask Akpan's family to stay but once they decided to stay, they were informed that

25  they would have to remain in one central location of Akpan's choosing.  Akpan decided that he

26  and his family were going to stay in the family room downstairs.  The family room is furnished

27  and a bathroom is located close by.  Testimony at the hearing established that the agents tried to

28  make it as comfortable as possible for Akpan and his family during the search.

1    Akpan argues that the search and seizure of Akpan's property should be invalidated

2  because the agents searched all the rooms in the house, the children's computer, the refrigerator,

3  and the garbage.  The evidence presented at the hearing showed that Akpan knew or was aware

4  that the Government was investigating his businesses.  Moreover, all of the billing for Akpan's

5  businesses were conducted from his residence.  Based on the totality of the circumstances, the

6  Court finds that the agents search of all the rooms in the house, the children's computer, the

7  refrigerator, and the garbage was reasonable.. Akpan may have been trying to hide his alleged

8  fraudulent scheme.  Lastly, the warrant, along with the affidavit and attachments was presented to

9  Akpan at the outset of the search.  There is no evidence to indicate that the search conducted on

10  Akpan's residence was executed in an unreasonable fashion. Therefore, the Court finds that the

11  execution of the search warrant on Akpan's residence was conducted in a reasonable manner.

12        **B.  Business Locations and Storage Units**

13        The Supreme Court has found that businesses are protected by the Fourth Amendment

14  from unreasonable intrusions of business property by agents of the Government, but to a lesser

15  degree than homes.  <u>Donovan v. Dewey</u>, 452 U.S. 594, 599 (1980).  It is the defendant's burden

16  to establish that business locations or storage unit searches violated any Fourth Amendment

17  rights.

18        Probable cause existed to search Akpan's business locations and storage units.  Moreover,

19  Akpan has failed to show that any expectation of privacy was violated when the Government

20  searched the following five locations: (1) 5020 East Tropicana Avenue, Suite 5B, Las Vegas,

21  Nevada; (2) 8536 Del Webb Boulevard, Las Vegas, Nevada; (3) 2797 S. Maryland Parkway,

22  Suite 12-A, Las Vegas, Nevada; (4) 4888 E. Tropicana Avenue, Unit 1017, Las Vegas, Nevada;

23  and (5) 4888 E. Tropicana Avenue, Unit 1018, Las Vegas, Nevada.  Based on the testimony

24  presented at the hearing, the Court finds that the searches conducted on Akpan's business

25  locations and storage units were reasonably executed and constitutionally valid.

26  **III. Incriminating Statements**

27        The Fifth Amendment provides, in pertinent part, that "[n]o person . . . shall be

28  compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  It has

- 10 -

1    long been established that "when an individual is taken into custody or otherwise deprived of his

2    freedom by the authorities in any significant way and is subjected to questioning, the privilege

3    against self-incrimination is jeopardized." Miranda v. Arizona., 384 U.S. 436, 478 (1966).  The

4    Supreme Court has noted that "without proper safeguards the process of in-custody interrogation

5    of persons suspected or accused of crime contains inherently compelling pressures which work to

6    undermine the individual's will to resist and to compel him to speak where he would not

7    otherwise do so freely." Arizona v. Mauro, 481 U.S. 520, 525 (U.S. 1987).  In order to prevent

8    this, the Supreme Court held in Miranda "that a person questioned by law enforcement officers

9    after being 'taken into custody or otherwise deprived of his freedom of action in any significant

10   way' must first 'be warned that he has a right to remain silent, that any statement he does make

11   may be used as evidence against him, and that he has a right to the presence of an attorney, either

12   retained or appointed.'" Stansbury v. California, 511 U.S. 318, 322 (U.S. 1994).  Miranda

13   warnings must be given before any custodial interrogation.  United States v. Kim, 292 F.3d 969,

14   973 (9th Cir. 2002).  If a violation of a person's Miranda rights occurs, any statements made by a

15   suspect should be excluded from trial.  Dickerson v. United States, 530 U.S. 428, 441-42 (2000).

16          In Miranda, the Supreme Court stated: "[b]y custodial interrogation, we mean questioning

17   initiated by law enforcement officers after a person has been taken into custody or deprived of his

18   freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966).  When

19   determining whether a suspect is in custody, "a court must examine all of the circumstances

20   surrounding the interrogation but the ultimate inquiry is simply whether there [was] a formal

21   arrest or restraint on freedom of movement of the degree associated with a formal arrest."

22   Stansbury, 511 U.S. at 322 (internal quotations omitted).  The court must ask "how a reasonable

23   man in the suspect's position would have understood his situation." Stansbury, 511 U.S. at 324.

24   Some factors courts use in helping decide whether a reasonable person would believe that he or

25   she was not free to leave are: "(1) the language used to summon the individual; (2) the extent to

26   which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the

27   interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain

28   the individual." United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).  When determining

1    whether a suspect is being interrogated, under standards outlined by the Supreme Court,

2    interrogation includes express questioning as well as "its functional equivalent." Mauro, 481

3    U.S. at 526. The Supreme Court has stated that "its functional equivalent" means "any words or

4    actions on the part of the police (other than those normally attendant to arrest and custody) that

5    the police should know are reasonably likely to elicit an incriminating response from the

6    suspect." Mauro, 481 U.S. at 526-27.

7         In the present matter, both parties have stipulated that Miranda warnings were not given

8    to Akpan before he was interviewed by the agents. In order to determine whether Akpan's Fifth

9    Amendment Rights were violated the Court must look at each interview separately.

10        **A. First Interview**

11        Prior to Akpan being interviewed, the agents informed him that he was not under arrest

12   and that the interview was voluntary. Akpan claims that he asked to speak with his lawyer but

13   was denied. "If a suspect indicates in any manner that he wishes to consult with an attorney

14   before speaking, there can be no questioning." Norman v. Ducharme, 871 F.2d 1483, 1486 (9th

15   Cir. 1989). "A request for counsel need not be stated as a model of eloquence and clarity in

16   order to qualify as an unequivocal invocation of the right to counsel." Alvarez v. Gomez, 185

17   F.3d 995, 997 (9th Cir. 1999)." Based on the testimony presented at the evidentiary hearing, the

18   Court finds that Akpan did not ask to speak with his attorney but asked, "Should I talk to my

19   lawyer?" The statement, "Should I talk to my lawyer?" is not a sufficient unequivocal request for

20   counsel; therefore, Akpan did not invoke his Fifth Amendment right to counsel. Ducharme, 871

21   F.2d at 1486; see also United States v. De La Jara, 973 F.2d 746, 750 (9th Cir. 1992) (explaining

22   "Should I call my lawyer?" does not constitute an invocation).

23        The Court finds that under the factors outlined in Kim, Akpan was not in custody during

24   the first interview. 292 F.3d at 974. The language used by the agents to solicit the interview was

25   respectful and cordial. During the first interview, Akpan was not confronted with evidence of

26   guilt. The interview was conducted in Akpan's living room with one agent sitting across and one

27   agent sitting on another side in a separate chair from Akpan. The duration of the first interview

28   was approximately two and one-half hours. Lastly, there was no pressure applied to detain

1   Akpan.  Based on the totality of the circumstances, the Court finds that Akpan was not in custody
2   during the first interview and was free to leave at any time.
3        The Court finds that Akpan was not subjected to a custodial interrogation during the first
4   interview.  The agents did not ask Akpan questions that were likely to elicit an incriminating
5   response.  Akpan was asked questions regarding his background, experience, finances, other
6   business ventures, and about general business operations.  At no time during the first interview
7   was he asked about specific or individual fraudulent incidents.
8        Based on the foregoing, the Court finds that Akpan was not subjected to a custodial
9   interrogation during the first interview; therefore, Miranda warnings were not needed to be given
10  and Akpan's Fifth Amendment rights were not violated.
11       **B. Second Interview**
12       Akpan's argues that his Fifth Amendment rights against self incrimination were violated
13  during the second interview. Akpan was not given any Miranda warnings prior to the second
14  interview.  Similar to the first interview, he  was informed that the interview was voluntary;
15  however, the scope of the questioning exceeded that customary to a normal interview.  The
16  Supreme Court has stated that if "any words or actions . . . that the police should know are
17  reasonably likely to elicit an incriminating response from the suspect," are used, the questioning
18  becomes an interrogation.  Mauro, 481 U.S. at 526.  Here, Akpan was not given any Miranda
19  warnings and Miranda warnings should have been given before the second interview began
20  because the agents knew that they were going to ask Akpan questions about specific fraudulent
21  incidents.  A reasonable person in Akpan's position would perceive the second interview as an
22  interrogation.
23        The Court finds that  the Government asked Akpan questions that were "reasonably
24  likely to elicit an incriminating response" without first giving Akpan his Miranda warnings.
25  Mauro, 481 U.S. at 526-27.  However, unlike Mauro, Akpan was still not in custody or its
26  equivalent during the second interview. Akpans's statements made during the second interview
27  will be not suppressed. A 2008 Ninth Circuit case was brought to the court's attention after the
28  evidentiary hearing. United States v. Craighead, 539 F.3d 1073 (9th Cir. 2008). After thorough

1   review and analysis, no change in the courts' findings and conclusions is required by the

2   <u>Craighead</u> case.

3   **IV.  Motion to Return Property**

4     During the suppression hearing, Akpan raised the issue that the Government is in

5   possession of property that should be returned to him.  The Court will not rule on this issue

6   because Akpan did not file a Motion under  Federal Rules of Criminal Procedure 41(g).

7            **CONCLUSION**

8     The Court finds that: (1) the search warrant, affidavit, and attachments were sufficiently

9   particular and constitutional and did not amount to a general unconstitutional search warrant; (2) the

10  searches conducted on Akpan's businesses, storage units, and residence were executed in a

11  reasonable manner; (3) Akpan was not subjected to a custodial interrogation during the two

12  interviews; and (4)  Akpan must file a Motion to Return Property pursuant to Federal Rules of

13  Criminal Procedure 41(g) before the Court will rule on the issue raised at the suppression hearing.

14         **RECOMMENDATION**

15    Based on the foregoing and good cause appearing therefore,

16    IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that the

17  Defendant's Motion to Suppress (#68) be **DENIED**.

18             **NOTICE**

19    Pursuant to Local Rule IB 3-2 **<u>any objection to this Report and Recommendation must</u>**

20  **<u>be in writing and filed with the Clerk of the Court on or before September 30, 2008</u>** The

21  Supreme Court has held that the courts of appeal may determine that an appeal has been waived due

22  to the failure to file objections within the specified time.  <u>Thomas v. Arn</u>, 474 U.S. 140, 142 (1985).

23  This circuit has also held that (1) failure to file objections within the specified time and (2) failure

24  to properly address and brief the objectionable issues waives the right to appeal the District Court's

25  order and/or appeal factual issues from the order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d

26  . . . .

27  . . . .

28  . . . .

1   1153, 1157 (9th Cir. 1991); <u>Britt v. Simi Valley United Sch. Dist.</u>, 708 F.2d 452, 454 (9th Cir.

2   1983).

3          DATED this _26th_ day of September, 2008.

 

 

 

 

                                             _____
                                               ROBERT J. JOHNSTON
                                               United States Magistrate Judge