1
2
3
4                         **UNITED STATES DISTRICT COURT**

5                              **DISTRICT OF NEVADA**

6
7   UNITED STATES OF AMERICA,            )
                                         )          2:05-cr-00304-RCJ-RJJ
            Plaintiff,                   )
8                                        )
            vs.                          )                **ORDER**
9                                        )
    ELIJAH WILLIE AKPAN,                 )
10                                       )
            Defendant.                   )
11   _____ )

12          On September 26, 2008, Magistrate Judge Robert J. Johnston issued a Report and

13   Recommendation (#129) in which he recommended that the Court deny Defendant's Motion to

14   Suppress Evidence. (#68). Now before the Court are Defendant's objections to certain portions of

15   the Magistrate Judge's Report and Recommendation ("R&R"). (#140). The Court must conduct a

16   de novo review of the record in this case in accordance with 28 U.S.C. § 636(b)(1)(B) and LR IB

17   3-2. IT IS HEREBY ORDERED that Magistrate Judge Robert J. Johnston's R&R is AFFIRMED

18   and ADOPTED and that Defendant's Motion to Suppress is DENIED.

19   **I.     FACTS**

20          Defendant Elijah Willie Akpan ("Akpan") operates a company called Tropicana Medical

21   Supply ("TMS") in Las Vegas, Nevada, which is a supplier of durable medical equipment ("DME")

22   (#82, SA Benedetti's Affidavit at 9). DME refers to products that are designed for repeated use and

23   for medical purposes, such as knee braces, prosthetic limbs, back braces, and wheelchairs. (*See id.*

24   at 8). TMS is authorized to submit claim forms to Medicare and Medicaid for reimbursement for

25   DME and medical supplies that TMS provides to Medicare and Medicaid beneficiaries.

1    Several years ago, the Health and Human Services-Office of Inspector General and the State

2   of Nevada Attorney General's Office commenced an investigation into Akpan and TMS's Medicaid

3   and Medicare billing practices.  (*See id.* at 9).   Plaintiff The United States of America (the

4   "Government") believed that Akpan was using his TMS business to defraud Medicare and Medicaid,

5   in violation of 18 U.S.C. § 1347, by billing the accounts of Medicare and Medicaid beneficiaries for

6   DME and medical supplies, which TMS (1) did not actually provide; (2) provided, but in amounts

7   that were less than claimed; (3) provided, but consisting of styles or models that were less expensive

8   than claimed; and (4) provided without seeking authorization or a prescription from a physician.

9   (*See id.*).  In late 2003 and early 2004, the Government interviewed several former TMS employees.

10  The Government's investigation led the Government to believe that it had probable cause to search

11  and seize evidence of Akpan's alleged fraudulent scheme from Akpan's residence and from TMS

12  business premises.

13    In January 2005, the Government secured a search warrant for six locations: Akpan's

14  residence, three TMS retail outlets, and two storage units used for TMS equipment and supplies (the

15  "Search Warrant").  (#82, Ex. A).  The Search Warrant consisted of the Search Warrant, a sworn

16  affidavit by FBI Special Agent Jason E. Benedetti ("SA Benedetti Affidavit"), and three attachments.

17  Attachment A listed six locations to be searched; Attachment B listed items to be seized; and

18  Attachment C listed the names of 101 Medicare/Medicaid beneficiaries who had been billed by TMS

19  between January 1, 2000 and September 1, 2003.  (#82, SA Benedetti's Affidavit at 16–17).

20    On January 5, 2005, federal agents for the Government executed the Search Warrant.  The

21  agents arrived at Akpan's residence at approximately 12:05 p.m.  (#82, Ex. A).  Upon arriving at the

22  door, the agents knocked and announced their presence and explained that they were executing a

23  federal search warrant on the residence.  (*See id.*).  Akpan was present at the home with his wife,

24  their three-year old daughter, Akpan's sister, his sister's fifteen-month old child, and Akpan's

25  mother.  (*See id.*).  The agents explained that no one was under arrest.  (*See id.*).

1    The agents performed a protective sweep to secure the residence. (*See id.*). Once the house

2  was secure, the agents informed Akpan and his family that they could leave at any time and were not

3  required to stay at the residence. (*See id.*). If they decided to leave the home, however, an agent

4  explained that Akpan and his family would not be allowed to re-enter until after the search was

5  completed. (#82, Ex. D, ¶6). Also, if Akpan and his family chose to stay in the home, an agent

6  instructed them that Akpan and his family would have to remain in a central location for the

7  protection and safety of the agents. (#82, Ex. C, ¶14). After discussing the options with his family,

8  Akpan told the agents that he and his family were going to stay in the home. (#82, Ex. D, ¶7).

9    After the search began, two agents asked Akpan if they could interview him. (#82, Ex. C,

10  ¶22). Prior to the interview, they informed Akpan that he was not under arrest, that the interview

11  was voluntary, and he could leave at any time. (*See id.*). Akpan asked if he needed his attorney.

12  The agents responded that they could not advise him on that matter. (*See id.* at ¶24). He responded

13  by stating that he had nothing to hide and agreed to speak to the agents without his attorney. (*See

14  id.*). Akpan was not given *Miranda* warnings. (*See id.* at ¶22). After the first interview was

15  completed, Akpan joined his family, who were staying in the basement. (*See id.* at ¶28). The agents

16  then asked Akpan if they could interview him again. (*See id.* at ¶29). Without giving him any

17  *Miranda* warnings, the agents interviewed Akpan again.

18    The search took approximately seven hours. (#82, Ex. A). At the conclusion of the search,

19  exit photographs and a videotape recording were taken to show the condition of the residence. (*See

20  id.*). Akpan, along with an agent, conducted a final walk through of the residence. (*See id.*).

21    In August 2005, Akpan was indicted on twelve charges of healthcare fraud. (#1). Akpan

22  pled not guilty. (#8). In May 2006, the Government filed a superseding indictment, bringing 129

23  counts against Akpan. (#25). Trial has been continued several times. In August 2007, Akpan filed

24  his Motion to Suppress (#68). In November 2007, the Magistrate Judge held a three-day evidentiary

25  hearing on the motion. (#99, #100, #103). The Magistrate Judge issued his R&R in September

1    2008, in which he recommended that Akpan's Motion to Suppress be denied.  Akpan has now

2    objected to certain portions of the R&R.  (#129, #140).

3    **II.     LEGAL STANDARD**

4    When considering a magistrate judge's report and recommendation denying a motion to

5    suppress, this Court "may accept, reject, or modify, in whole or in part, the findings or

6    recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1) (2005).  Further, under 28

7    U.S.C. § 636(b)(1), if a party makes a timely objection to the magistrate judge's recommendation,

8    then this Court is required to "make a de novo determination of those portions of the [report and

9    recommendation] to which objection is made." *Id.*  District courts are not required to conduct "any

10   review at all . . . of any issue that is not the subject of objection." *Thomas v. Arn*, 474 U.S. 140, 149

11   (1985); *see also* 28 U.S.C. § 636(b)(1) ("[T]he court shall make a de novo determination of those

12   portions of the [R & R] to which objection is made.").

13   Akpan has filed two primary objections to the R&R.  First, Akpan objects to the Magistrate

14   Judge's finding that the Search Warrant was sufficiently particular and constitutional under the

15   Fourth Amendment.  Second, Akpan objects to the Magistrate Judge's finding that the statements

16   that Akpan made during his interviews were not procured in violation of the Fifth Amendment.

17   During oral argument, Akpan also challenged the Magistrate Judge's finding that Akpan does not

18   have standing to challenge the search of the TMS business premises.

19   **III.    FOURTH AMENDMENT**

20   The Fourth Amendment requires that a warrant describe both the place to be searched and

21   the person or things to be seized.  *See* U.S. Const. amend IV.  The requirement of "specificity" has

22   "two aspects": "particularity and breadth . . . . Particularity is the requirement that the warrant must

23   clearly state what is sought.  Breadth deals with the requirement that the scope of the warrant be

24   limited by the probable cause on which the warrant is based." *U.S. v. SDI Future Health, Inc.*, ---

25

1   F.3d ----, 2009 WL 174910, at *9 (9th Cir. 2009) (quoting *In re Grand Jury Subpoenas Dated Dec.*

2   *10, 1987*, 926 F.2d 847, 856–57 (9th Cir. 1991) (internal citations omitted)).

3        **A.**     **Incorporation of the Affidavit**

4        Before evaluating the constitutionality of the Search Warrant, the Court must answer the

5   threshold question of whether the Search Warrant incorporated the accompanying affidavit. *See U.S.*

6   *v. SDI Future Health, Inc*., --- F.3d ----, 2009 WL 174910, at *7 (9th Cir. 2009). *See also, United*

7   *States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993) ("Only after the content of 'the search warrant'

8   is established . . . can the warrant be tested to see if it meets [the Fourth Amendment's]

9   requirements."). A warrant that is otherwise deficient for lack of particularity or overbreadth can be

10  cured by an incorporated affidavit. The Ninth Circuit requires two things in order for the

11  Government to rely on the affidavit to overcome deficiencies in a search warrant. First, the affidavit

12  must be expressly incorporated into and made a part of the warrant through use of "suitable words

13  of reference." Second, the affidavit must be present during the execution of the warrant so that it

14  can be referred to by the agents in guiding their seizure of documents or things. *See United States*

15  *v. Towne*, 997 F.2d 537, 545 (9th Cir. 1993).

16       The Search Warrant incorporated SA Benedetti's Affidavit. A warrant expressly incorporates

17  an affidavit when it uses "suitable words of reference." *SDI Future Health, Inc*., 2009 WL 174910

18  at *8. The Search Warrant expressly stated that SA Benedetti's Affidavit was "attached to and

19  incorporated" into the Search Warrant and that SA Benedetti's Affidavit established probable cause

20  for the Search Warrant. (#82, Ex. F). Although "there are no required magic words of

21  incorporation," the Search Warrant could not have more clearly expressed that it was incorporating

22  SA Benedetti's Affidavit.

23       Additionally, SA Benedetti's Affidavit was present during the execution of the Search

24  Warrant. Special Agent Hollie stated in his affidavit that he had a copy of SA Benedetti's Affidavit

25  when the search of Akpan's home was conducted. (#82, Ex. C, ¶15). Immediately prior to the

1  search, the agents had a "staging" meeting close to Akpan's residence during which the participating

2  agents were required to read SA Benedetti's Affidavit. (*See id.* at ¶3).   Therefore, the Affidavit was

3  present and available during the search, and that is all that is required.   Each agent who participated

4  in the search was not required to carry his or her own copy of SA Benedetti's Affidavit, and the

5  Government was not required to provide Akpan or his family members with a copy of the curative

6  document.   *SDI Future Health, Inc.*, 2009 WL 174910 at *8–9 (noting that the Supreme Court in

7  *United States v. Grubbs*, 547 U.S. 90 (2006) overruled the Ninth Circuit's previous position that

8  officers executing a search needed to "present any curative document . . . to the persons whose

9  property is to be subjected to the search.").   Because the Government made SA Benedetti's Affidavit

10  available during the search, the Affidavit accompanied the Search Warrant and served its purpose

11  of limiting the discretion of the federal officers in executing the search.   *See id.*

12      **B.      Particularity**

13      Particularity requires that a warrant's description be specific enough to enable the person

14  conducting the search reasonably to identify the things authorized to be seized.   *See United States*

15  *v. Silva*, 247 F.3d 1051, 1057 (9th Cir. 2001); *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir.

16  1986).   This requirement prevents general, exploratory searches and indiscriminate rummaging

17  through a person's belongings.   *See id.*; *United States v. McClintock*, 748 F.2d 1278, 1282 (9th Cir.

18  1984).   It also ensures that the magistrate issuing the warrant is fully apprised of the scope of the

19  search and can thus accurately determine whether the entire search is supported by probable cause.

20  *See Spilotro*, 800 F.2d at 963; *United States v. Hillyard*, 677 F.2d 1336, 1339 (9th Cir. 1982).

21      The specificity required in a warrant varies depending on the circumstances of the case and

22  the type of items involved.   *See Spilotro*, 800 F.2d at 963.   "Warrants which describe generic

23  categories of items are not necessarily invalid if a more precise description of the items subject to

24  seizure is not possible." *Id.*; *see also United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir. 1982).

25  "While a search warrant must describe items to be seized with particularity sufficient to prevent a

1   general, exploratory rummaging in a person's belongings, it need only be reasonably specific, rather

2   than elaborately detailed."   *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir. 1996) (internal

3   quotation marks and citations omitted).

4        In the Ninth Circuit's recent decision in *U.S. v. SDI Future Health, Inc*., the Court of Appeals

5   reviewed the constitutionality of a search warrant that was executed by the Internal Revenue Service

6   and four other federal and Nevada state agencies for SDI Future Health, Inc. ("SDI"), a California

7   corporation, that the Government believed to have been engaged in "wide-ranging Medicare fraud"

8   and tax fraud.   *Id.* at *1.   The warrant relied on an affidavit, which contained information that a

9   government agent had learned from three former employees and two business associates of SDI.   *See*

10  *id.*   The affidavit detailed the conspiracy in which SDI had participated in which it defrauded the

11  Medicare program by seeking payment for services that SDI had never rendered.   *See id.*   The district

12  court, affirming the magistrate judge's recommendation, concluded that the items listed in the search

13  warrant were overbroad and lacked sufficient particularity because "[t]he search warrant did not limit

14  these general categories of business documents and financial records to the seizure of records

15  relating to the criminal activity described in the affidavit," and because they lacked "any time

16  restriction."   *Id.* at *3.

17        The Ninth Circuit disagreed with the district court's finding that the warrant was

18  unconstitutional for lack of particularity.   The Court of Appeals concluded that "[e]ven the most

19  troubling items on the list, such as '[r]olodexes, address books and calendars,' are particular in that

20  they 'enable the person conducting the search reasonably to identify the things authorized to be

21  seized.'"   *Id.* at *9 (citation omitted).   To illustrate its point, the Court of Appeals explained that

22  "[t]he officers could tell from the warrant that, should they happen upon a rolodex, they should seize

23  it."   *Id.*   Thus, [b]ecause the warrant was not vague as to what it directed law enforcement officers

24  to search for and to seize," the warrant "did not lack particularity for Fourth Amendment purposes."

25  *Id.*   As a concluding statement on its decision related to particularity, the Court of Appeals explained

1  that the district court's erroneous reasoning was "understandable" because the Ninth Circuit's prior

2  treatment of this issue had conflated the particularity and overbreadth inquiries. *Id.* at *10.

3      The warrant in the present case is not any different from the warrant in *U.S. v. SDI Future*

4  *Health, Inc.* in that the items listed do not lack particularity.  There are certain items (*e.g.*,

5  appointment books, calendars, and business schedules) that are more general than others, but are not

6  vague as to what these categories directed law enforcement officers to search for and to seize.  To

7  follow the Ninth Circuit's reasoning, the officers executing the Search Warrant could have

8  understood from the warrant that, should they have found an appointment book or calendar, they

9  should have seized it.  Furthermore, SA Benedetti's Affidavit sufficiently detailed the criminal

10  activity that was the basis for the search so as to let the Government's agents understand "what it

11  [was] that they [were] being asked to search for and seize from the target property." *U.S. v. Bridges*,

12  344 F.3d 1010, 1017 (9th Cir. 2003) ("The Fourth Amendment requires search warrants to state with

13  reasonable particularity what items are being targeted for search *or, alternatively*, what criminal

14  activity is suspected of having been perpetrated.") (emphasis added)).  The agents were not "left to

15  speculate as to what [was] the underlying purpose or nature of the search." *Id.*  SA Benedetii's

16  Affidavit clarified that the agents were to not only seize any calendar or business schedule, but a

17  calendar or business schedule related to a Medicare or Medicaid scheme.  Thus, particularity is not

18  the problem with the warrant in this case.

19  **C.    Breadth**

20      "A warrant must not only give clear instructions to a search team, it must also give legal, that

21  is, not overbroad, instructions." *SDI Future Health, Inc.*, 2009 WL 174910, at *10.  "Under the

22  Fourth Amendment, this means that 'there [must] be probable cause to seize the particular thing[s]

23  named in the warrant.'" *Id.* (quoting *In re Grand Jury Subpoenas*, 926 F.2d at 857).  "[P]robable

24  cause means a fair probability that contraband or evidence of a crime will be found in a particular

25  place, based on the totality of circumstances." *Id.* (citations omitted).

1    Akpan contends that the Search Warrant is similar to those struck down by the Ninth Circuit

2  in the *Bridges* and *Kow* decisions.  In *United States v. Kow*, 58 F.3d 423 (9th Cir. 1995), the

3  defendants were indicted and convicted for corporate tax evasion, individual tax fraud and profit

4  skimming.  The affidavit in that case alleged that the business maintained multiple sets of accounting

5  records, paid falsified invoices submitted by phony corporations, and paid employees under the table

6  all for the purpose of defrauding the IRS.  *See id.* at 425.  The search warrant contained a list of

7  fourteen categories of documents to be seized.  *See id.*  Many, but not all, of the list of documents

8  consisted of nothing more than generalized descriptions of various types of business records.  *See*

9  *id.* at 427.  The Court of Appeals characterized this list as authorizing "the seizure of virtually every

10 document and computer file at HK Video."  *Id.*

11    The Ninth Circuit in *Kow* concluded that the most obvious manner in which the government

12 could have made the warrant more particular would have been to specify the suspected criminal

13 conduct.  *See id.* at 427.  At most, the warrant suggested that the warrant authorized the search and

14 seizure of evidence related "to 'fraudulent' transactions and possible disparities between actual and

15 reported income."  *See id.*  Additionally, the government did not limit the scope of the seizure to a

16 time frame in which the suspected criminal activity occurred even though the affidavit indicated that

17 the criminal activity began relatively late in the business's existence.  *See id.*  Finally, although the

18 affidavit described criminal acts related to violence and tax fraud, the affidavit did not detail a scope

19 of criminal conduct that would have established probable cause for all of the categories of records

20 listed in the warrant.  *See id.* at 427– 28,

21    In *United States v. Bridges*, 344 F.3d 1010 (9th Cir. 2003), the Ninth Circuit held that the

22 government's affidavit was sufficient to support probable cause that the defendant had engaged in

23 mail fraud and a conspiracy to defraud the United States by making false claims.  The affidavit

24 showed that the defendant operated a tax consulting business, through which he advised clients that

25 they could avoid paying federal income taxes if they declared that they were "non-resident aliens."

1   *Id.* at 1013.  The defendant's business filed more than 100 claims with the IRS requesting tax refunds

2   for its "non-resident alien" clients none of which were ever granted.  *Id.*   Although there was

3   probable cause to issue a search warrant, the Court of Appeals nevertheless held that the warrant's

4   description of the items to be seized violated the particularity requirement of the Fourth Amendment.

5          The attachment to the warrant in *Bridges* listed thirteen categories of generic types of

6   business records or equipment to be seized, but without any additional description of the items which

7   limited them to the criminal acts described in the affidavit.  *See id.* at 1017.  Although the warrant's

8   list of items was detailed, the Court of Appeals found that it was so expansive that its language

9   authorized the government to seize almost all of the defendant's property, papers, and office

10  equipment.  The Ninth Circuit, quoting *Kow*, noted that it had "criticized repeatedly the failure to

11  describe in a warrant the specific criminal activity suspected by the Government[.]" *Id.* at 1018.  The

12  warrant did not state what criminal activity was being investigated by the IRS and, thus, there was

13  nothing in the warrant to guide the government's agents in seizing property under the broad

14  categories of items to be seized.  *See id.  Bridges* concluded that such warrants are suspect because

15  "[n]othing on the face of the warrant tells the searching officers for what crime the search is being

16  undertaken." *Id.* (citation omitted).  Also, the warrant contained a catch-all phrase, authorizing the

17  seizure of all records relating to clients or victims "including but not limited to " the ones listed on

18  the warrant.  *Id.* at 1017–18.   Such open-ended language seemed to eviscerate any definite

19  boundaries to the scope of the search.

20         In *Bridges*, the Ninth Circuit, suggested that the government could have cured the warrant's

21  deficiencies by properly describing the relevant criminal activity through an affidavit.  A special

22  agent had submitted an affidavit with the warrant, which described the crimes the defendant had

23  allegedly committed, but the warrant neither incorporated the affidavit by reference, nor was a copy

24  of the affidavit physically attached to the warrant or any of its incorporated parts.  *See id.* at 1018.

25

1    The Court of Appeals acknowledged that providing the details of the specific crimes being

2    investigated by the IRS "would have served to limit the scope of the warrant." *Id.* at 1019.

3          In Akpan's case, Attachment B of the Search Warrant listed twenty-one categories of items

4    that were to be searched for and seized.  Akpan challenges virtually all of the listed items.  However,

5    when the Search Warrant and Attachment are read in connection with SA Benedetti's Affidavit, this

6    Court holds that the listed categories were not overbroad because probable cause did exist to seize

7    all items of those particular types of records.

8          There are a few of the categories of items that Akpan has focused his objections upon.

9    Akpan objects to paragraph (c), which authorized the seizure of the following:

10         Records, memoranda, correspondence, receipts, logs, billing statements, superbills,
           invoices, insurance claims, explanation of benefits reports, Medicare
11         payment/remittance reports, Medicaid payment/remittance reports, correspondence,
           and any other account information pertaining to patients for whom durable medical
12         equipment and supplies were billed.

13         All of the requested records relate to "patients for whom durable medical equipment and

14   supplies were billed." SA Benedetti's Affidavit and the investigation into Akpan and TMS centered

15   upon Akpan's billing practices related to "Durable Medical Equipment" ("DME"), which was a

16   defined term throughout SA Benedetti's Affidavit.  (SA Benedetti's Affidavit at 5).  In fact, the

17   Affidavit identified the specific types of DME and related health care supplies and services that were

18   the subject of Akpan's alleged scheme.  One section articulated the allegations with respect to power

19   wheelchairs; another treated the allegations regarding enteral nutrition supplies; another section laid

20   out the allegations related to the provision of incontinence supplies. (*See id.* 17–33).  Although the

21   Government was able to identify 103 beneficiaries who may have been victims of Akpan's

22   fraudulent practices, these names were merely a sample of possible victims.  The Government

23   undoubtedly knew that there were likely to be other beneficiaries that had been victimized by

24   Akpan's scheme, but it was not in a position to name every one.  "Warrants which describe generic

25   categories of items are not necessarily invalid if a more precise description of the items subject to

1  seizure is not possible." *Spilotro*, 800 F.2d at 963.  Thus, the Government cannot be faulted for not

2  identifying every beneficiary that TMS scammed.  By recovering the types of materials listed in

3  paragraph (c), however, the Government could possibly identify additional beneficiaries for whom

4  TMS had engaged in fraudulent billing practices.  The Government had probable cause to seize such

5  materials.  This paragraph was not overbroad.

6      Akpan objects to paragraph (g), which authorized the seizure of the following:

7      Communications between Tropicana Medical Supply and any delivery companies or
       other medical supply companies showing business relationships regarding medical
8      supplies, medical equipment, methods of delivery, proof of delivery, evidence of
       agreements to deliver products, or share in cash flow from such deliveries.

9

10     This paragraph is limited to a certain type of communication from a specific company.  The

11  entire investigation related to Akpan's wrongful billing practices conducted via TMS.  This

12  paragraph did not authorize the seizure of all TMS communications, but those related to medical

13  supplies and medical equipment, the subject matter of Akpan's scheme.  Such evidence would have

14  been highly relevant to the Government's investigation because the alleged scheme involved Akpan

15  billing Medicaid and Medicare for DME equipment and supplies, which Akpan or TMS never

16  actually ordered or provided to the beneficiaries.  Thus, there was probable cause to seize such

17  evidence as described in paragraph (g) and the language of paragraph (g) was sufficiently limited.

18     Akpan objects to paragraph (s), which authorized the seizure of "[p]assports, travel visas, and

19  any other records, documents, or materials which relate to the travel" of Akpan.  Although all of

20  Akpan's travel documents would be overbroad when standing on its own, when read in connection

21  with SA Benedetti's Affidavit, paragraph (s) obviously referred to travel documents related to the

22  alleged Medicare/Medicaid scheme.  The Government's investigation had revealed that over the

23  course of several years, Akpan had traveled numerous times to Nigeria and had transported

24  significant sums of cash to Nigeria.  (SA Benedetti's Affidavit at 36).  Thus, there was probable

25  cause to search and seize such evidence and the language in paragraph (s) was not overbroad.

Akpan objects to paragraph (f), which authorized the seizure of "[a]ppointment books, calendars, delivery logs, and business schedules." The Government could have been more specific with this category of items. However, the Court's reasoning to uphold this category of items is no different from that underlying the constitutionality of the other categories discussed above. When paragraph (f) is read in connection with SA Benedetti's Affidavit, the required specificity is present. The Government had probable cause to search and seize such evidence because the Government's investigation had revealed that Akpan had been supplying different DME and supplies than reported or not even supplying any DME or supplies at all. It would have been important to have delivery logs to determine whether certain reported DME or medical supplies were in fact delivered. Under Nevada law, as a DME supplier, TMS was required to document all deliveries for which it would be reimbursed. Such documents should have existed and would certainly have related to the Government's investigation. Appointment books, calendars, and business schedules could have revealed meetings or discussions with beneficiaries, their physicians, deliveries of DME and related supplies, Akpan's attendance of Medicaid/Medicare billing training, and travels over to Nigeria—all of which would have been relevant to the Government's investigation. In short, on its face, the language of paragraph (f) might have appeared to be overbroad, but when read and executed in connection with SA Benedetti's Affidavit, it is clear that there was probable cause to search and seize such evidence and that the language in paragraph (f) was not overbroad.

The list goes on and on. Akpan objects to paragraph (i), which authorized the search and seizure of "[r]eference materials, manuals, lists of procedure codes, price sheets, billing instructions, Medicare newsletters, Medicaid newsletters, memoranda and pamphlets of any information pertaining to the billing of Medicare and Medicaid." This list of items is related specifically to Medicare and Medicaid, the foundation of Akpan's alleged scheme. Information related to billing in particular and TMS's protocol for handling Medicare and Medicaid claims was essential to the Government's investigation. The Court does not see a need to kill a few extra trees to analyze all

1   twenty-one listed items in the Search Warrant.  The Court's position is the same for each one: any

2   deficiencies in the items listed in Attachment B were cured by the detailed affidavit incorporated into

3   the Search Warrant.  The Government had probable cause to seize all listed items and the language

4   used in the Search Warrant was not overbroad.

5           Akpan questions the breadth of the Search Warrant in light of the number of boxes of

6   documents that the Government ultimately seized.  However, the Ninth Circuit has acknowledged

7   that "[a]ny search for relevant documents is likely to retrieve some information that ultimately is

8   beyond the core of evidentiary material produced at trial."  *U.S. v. Rude*, 88 F.3d 1538, 1551 (9th

9   Cir. 1996), cert. denied, 519 U.S. 1058 (1997).  The Court cannot gauge the constitutionality of a

10  warrant based upon the mere number of documents that are ultimately seized.  *See, e.g., U.S. v.*

11  *Hayes*, 794 F.2d 1348 (9th Cir. 1986) (denying argument that warrant was overbroad because it

12  allowed the government to examine thousands of files and stating that "[t]he number of files that

13  could be scrutinized, however, is not determinative.").

14          **D.      Time Restriction**

15          Akpan stresses the absence of express time limitations on the categories of evidence listed

16  in the Search Warrant.  The Ninth Circuit, in *Center Art Galleries* and *Kow*, criticized the absence

17  of time limitations in the warrants regarding the generically described documents in those cases.  The

18  Search Warrant stated that the probable case was based on SA Benedetti's Affidavit, which

19  described the investigation into Akpan's alleged fraudulent practices as revealed by billing records

20  dating back to 2000.  In connection with the suppression hearing conducted by the Magistrate Judge,

21  the Magistrate Judge reviewed, in camera, a detailed schedule of items seized by the Government.

22  (#109 at 7–8).  After reviewing the schedule, the Magistrate Judge determined that a mere 55 out of

23  8,167 documents seized predated 2000.  Such a finding is indicative of an understanding by the

24  agents enforcing the Search Warrant of an approximate time limit on the records to be seized, which

25  time limit was consistent with the information provided in SA Benedetti's Affidavit.  Although the

1   Government could have included a time period in the warrant to limit the seizure to the period

2   beginning from a more precise date, the Court finds that such a limitation was not reasonably

3   required in regard to the foregoing categories of documents.

4          Akpan argues that a search warrant cannot be upheld if there is no date restriction on the

5   records to be searched.  The law does not support Akpan's position.  In cases such as *Kow*, the Ninth

6   Circuit has discussed its concern with the lack of a time restriction, but such cases clearly reveal that

7   the crux of the problem with the warrants in those cases was the failure to sufficiently describe the

8   items to be searched and the criminal activity that was the subject of the search warrant.  In *Kow*, the

9   Ninth Circuit stated that the most obvious manner in which the government could have corrected the

10  deficient warrant was by describing the applicable criminal violation, not adding a time restriction.

11  *See* 58 F.3d at 427.

12         To adopt Akpan's position that a time restriction is the sine qua non of the constitutionality

13  of a search warrant would fly in the face of Supreme Court precedent.  In *United States v. Grubbs*,

14  the Supreme Court held that an anticipatory search warrant did not contravene the Fourth

15  Amendment for its failure to expressly include the triggering condition for the anticipatory warrant.

16  The Court reasoned that the Fourth Amendment "does not set forth some general 'particularity

17  requirement.'"  *Id*. at 97.  Relying upon the text of the Fourth Amendment, the Court observed that

18  the Fourth Amendment "specifies only two matters that must be 'particularly describ[ed]' in the

19  warrant: 'the place to be searched' and 'the persons or things to be seized.'"  *Id*.  The Court added

20  that it has "rejected efforts to expand the scope of this provision to embrace unenumerated matters."

21  *Id*.  A time limitation is not one of the two prerequisites for a warrant to pass muster under the

22  Fourth Amendment.  The Court must follow the Supreme Court's lead in declining to expand the

23  scope of the Fourth Amendment.  The lack of an express timing requirement in the Search Warrant

24  or SA Benedetti's Affidavit did not render the Search Warrant unconstitutional.

25

### E.    Standing to Challenge Search of Business Premises

The Magistrate Judge concluded that Akpan does not have standing to challenge the Search Warrant as to the other five locations searched.  Akpan did not raise an objection to this finding in his papers objecting to the R&R, but he expressed his objection to this finding during oral argument. Therefore, the Court will address Akpan's objection.

Akpan's objection relates to the search of five TMS-related locations.  Three of the locations were used as retail outlets for the TMS business and the two other locations served as storage units for TMS equipment and supplies.

Akpan's right to challenge the search of commercial premises under the Fourth Amendment is different from his right to do so for his home.  The Supreme Court decided long ago that the Fourth Amendment "protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967). To show the government has violated his Fourth Amendment rights, an individual must have "a legitimate expectation of privacy in the invaded place." *United States v. Crawford*, 323 F.3d 700, 706 (9th Cir. 2003) (internal quotation marks and citations omitted).  "An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700 (1987).  Although the expectation of privacy in one's workplace is different, it may still exist in certain circumstances. *SDI Future Health, Inc*., 2009 WL 174910, at *4.

Akpan argues that he had an expectation of privacy in the other five searched locations because (1) he and his wife are sole shareholders of TMS; (2) he leased the premises that were searched; (3) he has the right to exclude others from the premises as the renter; and (4) he uses the searched premises and keeps personal items there.  (#89, Ex. A).  In *SDI Future Health, Inc*., the Ninth Circuit explained its position regarding the standing of a corporate employee or officer to challenge a search of corporate premises.  In that case, the government argued that Todd Kaplan,

1   who was the president and part-owner of SDI, and Jack Brunk, who was an officer and part-owner

2   of SDI, lacked standing to challenge the government's search of SDI's premises.  *See id.* at *3.

3            The Ninth Circuit offered several "guideposts" to direct this analysis.  First and foremost, "it

4   is crucial to Fourth Amendment standing that the place searched be 'given over to [the defendant's]

5   exclusive use."  *Id.* at *4.  Although Akpan asserts that he used the searched premises as his office.

6   His mere use is not enough.  Akpan must have had exclusive use of the searched premises.  Akpan

7   has presented no evidence that he was the only individual who had access to and who used the

8   searched premises.  Additionally, the Ninth Circuit articulated that possessing "managerial authority

9   alone" or a proprietary interest in the business does not create a privacy interest: "a reasonable

10  expectation of privacy does not arise *ex officio*, but must be established with respect to the person

11  in question."  *Id.*  Therefore, Akpan's ownership or managerial control over the business and its

12  premises does not automatically create an expectation of privacy in the searched premises.

13           The business owners in *SDI Future Health, Inc.* had relied upon the Ninth Circuit's decision

14  in *United States v. Gonzalez*, 412 F.3d 1102 (9th Cir. 2005), where the Court of Appeals had upheld

15  a business owner's standing to challenge the search of business premises.  *SDI Future Health, Inc.*,

16  2009 WL 174910, at *4–5.  The Ninth Circuit rejected the reliance upon *Gonzalez*, highlighting the

17  narrowness of its holding in that decision.  In *Gonzalez*, the business was a small, family-owned

18  business; the defendants managed the day-to-day operations of the business; and the defendants

19  owned the building in which the business offices were located and had access to the entire building.

20  *Id.* at *5.  Because the defendants in *SDI Future Health, Inc.* did not operate SDI on a daily basis as

21  a family-owned business, the Ninth Circuit declined to find *Gonzalez* controlling.  The Ninth Circuit

22  went on to hold that "except in the case of a small, family-run business over which an individual

23  exercises daily management and control, an individual challenging a search of workplace areas

24  beyond his own internal office must generally show some personal connection to the places searched

25  and the materials seized."  *Id.* at *6.

1    Because there is no evidence that the facts of Akpan's situation mirror those of *Gonzalez*,

2   Akpan must show some "personal connection" to the places searched and materials seized.  To

3   establish a "personal connection," Akpan must produce evidence regarding the following factors:

4   "(1) whether the item seized is personal property or otherwise kept in a private place separate from

5   other work-related material; 2) whether the defendant had custody or immediate control of the item

6   when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure

7   the place searched or things seized from any interference without his authorization."  *Id.*  Despite

8   having a three-day evidentiary hearing on his motion to suppress, Akpan has failed to produce any

9   evidence that would go to any of these three factors.  He has not explained that the Government

10  seized evidence from the TMS premises that was in fact personal property as distinguished from

11  property that had a relationship to his TMS business or that Akpan took personal precautions to

12  protect such property from being seized.  With respect to the storage units, Akpan has admitted that

13  he did not use those units as an office or for personal use, but that it was used only for the TMS

14  business.  (#89, Akpan Declaration, ¶¶ 4–5).  Although he may have kept some personal items at the

15  other retail locations or had an office in those locations, he did not exclusively use those locations.

16  According to the Government's report, Akpan employed eight to nine individuals to work at the

17  retail outlets.  (#82, Ex. B at 2).  In sum, the fact that Akpan owned the TMS business, rented out

18  the searched TMS premises, and kept some personal items in those premises does not establish the

19  "personal connection" or "exclusive use" that the Ninth Circuit has required to create a legitimate

20  expectation of privacy interest in the searched business premises.  Akpan has the burden of

21  establishing his legitimate expectations of privacy in the searched premises.  *United States v.*

22  *Zermeno*, 66 F.3d 1058, 1061 (9th Cir. 1995).  The evidence that he has proffered has failed to meet

23  that burden.

24    In light of the foregoing, the Court holds that the Search Warrant met the Fourth

25  Amendment's specificity requirements.  The Search Warrant, in connection with SA Benedetti's

1   Affidavit, was sufficiently particular and was not overbroad.  Additionally, the Court holds that

2   Akpan did not have a legitimate expectation of privacy in the commercial premises that were

3   searched and he does not have standing to challenge those searches.

4   **IV.    FIFTH AMENDMENT**

5          The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case

6   to be a witness against himself."  U.S. Const. amend. V.  In *Miranda v. Arizona*, the Supreme Court

7   held that a suspect must be advised of his Fifth Amendment rights before being subject to a custodial

8   interrogation.  384 U.S. 436, 444–45 (1966); *see also, Dickerson v. United States*, 530 U.S. 428

9   (2000) (holding *Miranda* to be constitutional).  The parties agree that Akpan was interrogated but

10  not given *Miranda* warnings.  Therefore, the only issue before this Court is whether Akpan was in

11  custody at the time of his interrogation.

12         When a suspect has not formally been taken into police custody, a suspect is nevertheless

13  considered "in custody" for purposes of *Miranda* if the suspect has been "deprived of his freedom

14  of action in any significant way."  384 U.S. at 444.  To determine whether the suspect was in

15  custody, the Court first examines the totality of the circumstances surrounding the interrogation.  *See*

16  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  The Court must then determine whether a

17  reasonable person in those circumstances would "have felt he or she was not at liberty to terminate

18  the interrogation and leave."  *Id.*  Accordingly, taking into account the totality of the circumstances,

19  the Court must decide whether a reasonable person in Akpan's position would have felt deprived of

20  his freedom of action in any significant way, such that he would not have felt free to terminate the

21  interrogation.

22         The Ninth Circuit recently released its opinion in *U.S. v. Craighead*, 539 F.3d 1073 (9th Cir.

23  2008), which is on point to the issue in this case: "under what circumstances under the Fifth

24  Amendment does an interrogation by law enforcement officers in the suspect's own home turn the

25  home into such a police-dominated atmosphere that the interrogation becomes custodial in nature

and requires *Miranda* warnings?"  *Id.* at 1077 (emphasis added).  In *Craighead*, the FBI investigated and determined that the defendant was in possession of and had distributed child pornography.  *See id.* at 1078.  The FBI secured a search warrant for his home.  *See id.*  Eight law enforcement officers from three different agencies participated in the search of his home.  *See id.*  Two agents asked the defendant to have a conversation with them in a storage room in the back of the defendant's home.  *See id.*  The agents did not read the defendant his *Miranda* rights, but informed him that he was not being arrested and that he was free to leave at anytime.  *See id.* at 1078–79.  During the interview, the defendant made incriminating statements.

The Ninth Circuit observed that the typical standard that requires a court to determine whether a reasonable person would have felt deprived of his freedom of action in any significant way presents "analytical challenges" when the relevant interrogation took place within the home.  *See id.* at 1082.  The Ninth Circuit framed the novelty and complexity of this situation by stating the following: "If a reasonable person is interrogated inside his own home and is told he is 'free to leave,' where will he go? The library? The police station? He is already in the most constitutionally protected place on earth.  To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home."  *Id.* at 1083.  The Ninth Circuit acknowledged that courts have "generally been much less likely to find that an interrogation in the suspect's home was custodial in nature."  *Id.*  At the same time, "an interrogation in the suspect's home may be found to be custodial under certain circumstances."  *Id.*  Because of the unique nature of an interrogation inside the suspect's own home, the Ninth Circuit determined that the *Craighead* case required it to "consider how to apply the traditional *Miranda* inquiry to an in-home interrogation," an issue on which the Ninth Circuit had previously "said little."  *Id.* at 1082.

The Ninth Circuit determined that drawing the line between a "non-custodial in-home interrogation from a custodial one" hinges on "the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a

1   'police-dominated atmosphere.'"  *Id.* at 1083.  To render a decision on this "police-dominated

2   atmosphere" benchmark, the Ninth Circuit determined that a court should consider the following

3   four factors:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

7   *Id.* at 1084.

8   **A.      Number of Law Enforcement Officers**

9           First, the Court should examine the number of law enforcement officers that participated in

10   the search of Akpan's residence.  "[T]he presence of a large number of visibly armed law

11   enforcement officers goes a long way towards making the suspect's home a police-dominated

12   atmosphere."  *Id.*  The Ninth Circuit stated that "when the number of law enforcement personnel far

13   outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will

14   be stopped by one of the many officers he will encounter on the way out."  *Id.* at 1083–84.  In one

15   of the primary cases relied upon by the Ninth Circuit,  *United States v. Mittel-Carey*, 493 F.3d 36,

16   40 (1st Cir. 2007), the First Circuit determined that the presence of eight officers in the home, one

17   of whom unholstered his gun, contributed to a police-dominated environment.  *Id.* at 1085.

18   Similarly, in *Craighead*, eight law enforcement officers, accompanied by two other non-law

19   enforcement officers entered the defendant's home as part of the search.  *See id.*  The law

20   enforcement officers were all armed, some had protective gear, and some of them unholstered their

21   weapons.  *See id.*  As a result, the Ninth Circuit held that a reasonable person in the defendant's

22   position would feel that his home was dominated by law enforcement agents and that they had come

23   prepared for a confrontation.  *See id.*

24           In the present case, approximately ten FBI agents participated in the search of Akpan's home.

25   (#82, Ex. D).  In addition, one or two computer forensics experts participated.  (#82, Ex. C).  All ten

1   law enforcement agents donned bulletproof vests and raid gear.  (#82, Ex. D).  They were armed.

2   (*See id.*).  Whether any of them unholstered their weapons is unclear.  Akpan and his wife said that

3   some agents drew their weapons (#68, Ex. A and B), but certain agents said they did not.  (#82, Ex.

4   C, at ¶ 6).  Although Akpan's family members were also present, it was clear that the only suspect

5   who was the subject of the investigation was Akpan.  The first *Craighead* factor weighs in Akpan's

6   favor.  The number of law enforcement officers outnumbered Akpan.

7          **B.     Restraint**

8          Second, the Court must consider whether the suspect was at any point restrained, either by

9   physical force or by threats.  In *Craighead*, the defendant was not physically restrained, but was

10  escorted to a back storage room and the door was closed behind him.  *See id.* at 1086.  The Ninth

11  Circuit focused on the fact that one of the agents in the storage room appeared (according to the

12  defendant) to be leaning with his back to the door in such a way as to block the defendant's exit from

13  the room.  *See id.*  The defendant testified that he did not feel he had the freedom to leave the storage

14  room because, in order to get to the room's only door, he "would have either had to have moved the

15  police detective or asked him to move."  *Id.*  The Ninth Circuit acknowledged that "not everyone in

16  this circumstance would have felt restrained," but that "it was certainly objectively reasonable for

17  [the defendant] to believe he was under guard."  *Id.*

18         The present case is different.  Like the defendant in *Craighead*, Akpan was not physically

19  restrained or handcuffed.  (#82, Ex. C).  Unlike the defendant in *Craighead*, Akpan was not in a

20  closed-off room, the only exit of which was blocked by an armed officer.  (*See id.*).  Instead, Akpan

21  sat in an open den area next to the kitchen.   (*See id.*).  Also, Akpan chose where to sit and sat on a

22  couch facing the open door of his home, not on a box like the defendant in *Craighead*.  (*See id.*).

23  Akpan's family remained in a large furnished room in the basement.

24         However, the Ninth Circuit stated that "[r]estraint amounting to custody may also be inferred

25  where law enforcement officers permit the suspect to move around the house for brief periods but

1    insist on escorting and monitoring him at all times." 539 F.3d at 1085.  In *Mittel-Carey*, the First

2    Circuit found custody to have occurred because during the course of the government's interrogation

3    of the defendant, government agents escorted the defendant whenever he needed to move, such as

4    when he needed to go to the bathroom.  493 F.3d at 40.  Akpan's wife stated that in the one or two

5    instances where she needed to leave the basement where the family was remaining during the search,

6    she felt like she had to ask permission from the agents.  (#68, Ex. B).  For example, when she needed

7    to get some food for her three-year old daughter, she felt like she needed to ask one of the agents

8    permission to go to the kitchen.  (*See id.*).

9         One fatal flaw in Akpan's case is Akpan's consent to remain in the home during the search.

10   Although Akpan's family may have been limited in their movement while in the confines of their

11   home, the Government explained to Akpan and his family that they could leave the residence during

12   the search, but that if they remained in the home during the search, they needed to remain in one

13   location.  Some limitation on the family's movements within the home during the course of the

14   search was reasonably necessary to preserve the integrity of the search.  *See, e.g., United States v.*

15   *Axsom*, 289 F.3d 496, 503 (8th Cir. 2002) (deciding that a reasonable person in the suspect's "shoes

16   should have realized the agents escorted him not to restrict his movement, but to protect themselves

17   and the integrity of the search.").  Akpan and his family agreed to remain in the house under those

18   conditions.  Akpan argues that in addition to being escorted around the home, the Government

19   blocked Akpan's vehicles in the driveway and would have been required to ask the Government to

20   move their cars to leave.  However, Akpan and his family could have still left the home and stayed

21   outside or walked around the neighborhood.  According to Akpan's statements in her declaration,

22   Akpan's family appears to have been friends with their neighbors.  (#68, Ex. B at ¶ 7).

23        In *Craighead* and the cases relied upon by the Ninth Circuit in that case, the government

24   agents' conduct was such that it gave the appearance to the suspects that they could not leave.  *See,*

25   *e.g., Sprosty v. Buchler*, 79 F.3d 635, 642–43 (7th Cir. 1996) (finding that police officers' use of

1   their police cars to block the suspect's driveway to prevent his departure, and their standing so as to

2   block the suspect's exit path from his home, contributed to a custodial environment).  Such conduct

3   by government agents should fall, in certain circumstances, within the ambit of restraint or custody.

4   One can envision situations where law enforcement officers could tip-toe their way to the outer

5   boundaries of *Miranda* to interrogate a suspect without technically subjecting the suspect to custody

6   and triggering *Miranda*.  For example, an officer could tell a suspect that he is free to leave an office

7   or room, but the suspect soon finds out that the door is being guarded by an armed police officer and

8   his drooling, superbly trained attack dog.  Alternatively, an officer could omit to tell the suspect that

9   she is free to leave her home and give her significant freedom to move from room to room, but the

10  suspect soon finds out that she cannot even make a cup of coffee without an officer peering over her

11  shoulder to see how many lumps of sugar she is using.  In these hypothetical scenarios, one can see

12  how law enforcement officers could simultaneously succeed in complying with and frustrating the

13  policies underlying *Miranda*.  Courts understandably want to discourage such strategic interrogation

14  on the part of law enforcement.  To that end, courts, like those in *Craighead* and *Sprosty*, have held

15  that law enforcement can still restrain a suspect and put them in custody, triggering *Miranda,* even

16  though they do not physically restrain or threaten the suspects.  Where the facts reflect an obvious

17  effort on law enforcement's part to indirectly or implicitly restrict the suspect's freedom, such that

18  a reasonable suspect would "have felt he or she was not at liberty to terminate the interrogation and

19  leave," custody is properly found.  *Craighead*, 539 F.3d at 1088.

20          The present case simply does not display such efforts on the part of the Government.  If

21  Akpan and his family had been required to stay in the home and then needed escorting throughout

22  the home, such a situation may have risen to the level of restraint.  Even if the Government had

23  simply failed to explain that Akpan could leave the home, custody may have occurred.  To the

24  contrary, the Government expressly explained to Akpan and his family at the outset and during the

25  course of the search that they were free to leave the home.  Akpan complains about the constraints

1  upon him and his family in the home.  However, some restrictions and supervision were required to

2  protect the integrity of the search.  *See Axsom*, 289 F.3d at 503.  Akpan does not allege that either

3  him or his family once asked any of the agents to leave the home and that the agents denied their

4  request.  Akpan was aware of his freedom to leave.  The invitation to leave the home was left open

5  during the search.  During that time, his family members were safely sitting around the television

6  in a large, furnished room in the basement and Akpan, when not with his family, was sitting on a

7  couch in his open den.  There was no scowling, sinister government agent standing guard at the door.

8  For these reasons, the second factor weighs in favor of the government.

9  **C.    Isolation**

10  Third, the Court must consider whether the suspect was isolated from others.  "A frequently

11  recurring example of police domination concerns the removal of the suspect from the presence of

12  family, friends, or colleagues who might lend moral support during the questioning and deter a

13  suspect from making inculpatory statements . . . ."  *Craighead*, 539 F.3d at 1087 (quoting *United*

14  *States v. Griffin*, 922 F.2d 1343, 1352 (8th Cir. 1990).  In *Craighead*, the defendant was not with

15  family or friends when the government conducted the search, but the government had brought along

16  a non-law enforcement officer for emotional support.  However, when the agents questioned the

17  defendant in the storage room, they would not allow that individual in the interview.  *See id.* at 1087.

18  The Ninth Circuit found this conduct of exclusion as indicative of the government's control of the

19  defendant's environment: "it is difficult to see how [the defendant] was free to leave if he was,

20  apparently, not free to invite others into the storage room of his own house."  *See id.*

21  In the present case, the third factor weighs in favor of Akpan.  The Government interviewed

22  Akpan twice.  The first interview took two and a half hours.  (#82, Ex. C).  The Government

23  separated Akpan from his family during this interview.  Once the Akpan completed the first

24  interview, he joined his family in the basement.  Once the Government decided that they had

25  additional questions to ask Akpan, they again separated Akpan from his family for another interview.

1   (*See id.*).  The Government made no effort nor suggested that Akpan could answer the Government's

2   questions in the presence of his family.  The Supreme Court has been explicit that "the law

3   enforcement technique of isolating the suspect from family and friends is one of the distinguishing

4   features of a custodial interrogation." *Id.* at 1087.  This factor weighs in favor of Akpan.

5           **D.      Informed of Ability to Leave**

6           Fourth, the Court must consider whether the suspect was informed that questioning was

7   voluntary and that he was free to leave or terminate the interview.  The Ninth Circuit stated that "[i]f

8   a law enforcement officer informs the suspect that he is not under arrest, that statements are

9   voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that

10  a suspect will reasonably believe he is in custody." *Id.*  In *Craighead*, because the government had

11  told the defendant that he was not under arrest, that his statements were voluntary, and that he was

12  free to leave, this fourth factor weighed in favor of the government. *See id.*         However, the

13  Ninth Circuit noted that "[t]he mere recitation of the statement that the suspect is free to leave or

14  terminate the interview, however, does not render an interrogation non-custodial per se" and that it

15  had to "consider the delivery of these statements within the context of the scene as a whole." *Id.* at

16  1088.

17          The most important foundation for the Ninth Circuit's finding that the defendant in

18  *Craighead* was in custody, even if the government had told him he was free to leave, was the

19  location of the interview.  The Ninth Circuit stated that "[a]n interview conducted in a suspect's

20  kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar

21  surroundings of the home and decrease the sensation of being isolated in a police-dominated

22  atmosphere." *Id.*  In contrast, the defendant had been taken to an unfurnished storage room in the

23  back of his home, which required the defendant to sit on a box or chair borrowed from another room.

24  *See id.* at 1089.  Also, the room had one door, which was partially blocked by one of the agents.

25

1    Another important part of the Ninth Circuit's finding was that the eight agents were from

2  three different agencies.  The defendant believed that the presence of agents from three different law

3  enforcement agencies left him with doubt as to whether the interviewing agent had the authority to

4  pronounce him free to leave and that even if the FBI permitted him to leave the storage room, he

5  thought that he might be confronted by members of the other two agencies and forbidden to leave

6  the house.  *See id.* at 1088.

7    Neither of these facts are present in this case.  Only one agency, the FBI, was present during

8  the search.  Thus, Akpan did not have the same type of doubt as the defendant in *Craighead* as to

9  which agent or agency had the authority to let him leave.  Also, Akpan was seated in a comfortable,

10  open, furnished room of the home.  In fact, he was questioned in the den area, probably the same area

11  where Akpan and his family invited guests to sit.   Thus, this factor weighs in favor of the

12  Government.

13    Viewing the totality of circumstances, the Court holds that the Government did not turn

14  Akpan's residence into a "police-dominated atmosphere."  A crucial part of this result is that Akpan

15  could have removed him and his family from any possibility of interaction with the police by simply

16  telling the agents at the outset of the search that they would accept the Government's invitation to

17  leave the home.  If Akpan had simply accepted the Government's invitation to leave, Akpan would

18  not have even been in the presence of the government agents and would possibly never have been

19  in a position to be asked to engage in an interview with government agents.   Another important

20  finding to this result is the respectful and comfortable manner in which the interview was conducted.

21  Akpan was in one of the most inviting, open, and comfortable portions of his home.  He was seated

22  comfortably on one of the couches of his choice.  There are no allegations that any of the questions

23  or comments by the interviewing agents were aggressive or overbearing.  Although there were over

24  ten agents involved in the search, only two of those agents sat down with Akpan and talked with him.

25  There is no evidence that they used any strong arm tactics during the interview or assumed an

1   aggressive posture with Akpan.  They explained to him that he did not have to talk, but Akpan

2   agreed to do so, explaining to the agents that he had nothing to hide.

3        For these reasons, the Court holds that Akpan was never in custody and that his Fifth

4   Amendment right against self-incrimination was not violated.  This holding is consistent with the

5   Ninth Circuit's observation that "courts have generally been much less likely to find that an

6   interrogation in the suspect's home was custodial in nature." *Craighead*, 539 F.3d at 1083 (citations

7   omitted).

8                                    **CONCLUSION**

9        IT IS HEREBY ORDERED that the Magistrate Judge's R&R is AFFIRMED and

10  ADOPTED.  (#129).  IT IS FURTHER ORDERED that Akpan's Motion to Suppress is DENIED.

11  (#68).

12        DATED: February 12, 2009

13

14        _____
             Robert C. Jones
15           United States District Judge

16

17

18

19

20

21

22

23

24

25  (bb)